**WHEELING STEEL CORPORATION v. GLANDER, Tax Commr.**
**NATIONAL DISTILLERS PRODUCTS CORPORATION, N. Y.**
**v. GLANDER, Tax Commr.**

Supreme Court of the United States.

Nos. 447-448.   Decided June 20, 1949.

John M. Caren, Columbus, for appellant Wheeling Steel Corporation.

Charles H. Tuttle and Paul L. Peyton, of the firm of Breed, Abbott and Morgan, New York City, N. Y., and Isadore Topper and R. Brooke Alloway, Columbus, for appellant National Distillers Products Corporation.

W. H. Annat, Wooster, for appellees.

Mr. Justice Jackson delivered the opinion of the Court.

## OPINION

By JACKSON, J.

The State of Ohio has laid an ad valorem tax against certain intangible property, consisting of notes, accounts receivable and prepaid insurance, owned by foreign corporations. As applied to appellants in these two cases, the tax is challenged as violating the Federal Constitution on several grounds which may conveniently be considered in a single opinion. Facts are not in dispute.

Appellant Wheeling Steel Corporation is organized under the laws of Delaware, where it maintains a statutory office. Ohio has authorized it to do business in that state and four of its eight manufacturing plants are located there. General offices, from which its entire business is controlled and conducted, are in Wheeling, West Virginia. Its officers there have custody of its money, notes and books of account. In twelve other states, including Ohio, it maintains sales offices which solicit and receive orders for its products subject to acceptance or rejection at the Wheeling office, to which all are forwarded. From this office only may credit be extended to purchasers. Accounts are billed and collected from the Wheeling office and the sales offices have no powers or duties with respect to collection. All accounts or notes receivable are payable at Wheeling, where the written evidences thereof are kept. Proceeds from receivables are taken into appellant's treasury at Wheeling and there applied to general purposes of the business.

Appellant National Distillers Products Corporation is organized under the laws of Virginia, where it has a statutory office and holds annual stockholders meetings. It is admitted to do business in Ohio. where it maintains a distillery, or rectifying plant, and warehouse, as it does also in six other states. Pay roll checks for plant employees are drawn on funds deposited in banks in the locality of the plant. Appellant also is licensed to do business in New York, where it maintains its principal business office and conducts its fiscal affairs and from which all business activities are directed and controlled. The Corporation maintains regional sales offices

in various of those states which permit private distribution of liquor. In such states customers are solicited and orders taken, subject to acceptance or rejection at New York. It maintains no sales office in Ohio, where dispensing liquor is a state monopoly. Orders from Ohio state authorities are forwarded directly to the offices in New York and are subject to acceptance or rejection there. When the New York office accepts an order from any source, it sends shipping orders to various plants, none of which makes any shipments except upon such orders. Only in New York can any credits be approved and all books, records and evidences of accounts receivable are kept there. Collections are managed from New York, which is the place of payment of all receivables. During the tax year in question, the Corporation solicited and took orders through agents in states other than Ohio for a large quantity of liquor shipped from its plants and warehouses in Ohio to customers elsewhere.

It is stipulated that appellants each paid all franchise or other taxes required by Ohio for admission to do business in the state and paid all taxes assessed upon real and personal property located in said state.

The Wheeling Company also paid to the state of West Virginia, for the year in question, ad valorem taxes on all of its receivables, including those sought to be taxed by Ohio, pursuant to this court's decision in Wheeling Steel Corp. v. Fox, 298 U. S. 193, 56 S. Ct. 773, 80 L. Ed. 1143. Neither Virginia nor New York has sought to tax the accounts receivable of National Distillers involved herein.

The Ohio Tax Commissioner, applying §§5328-1 and 5328-2 GC[1] assessed for taxation in Ohio a large amount of notes and

1. Pertinent parts of the Ohio law read as follows:

"*Section 5328-1 GC*: * * * Property of the kinds and classes mentioned in §*5328-2 GC*, used in and arising out of business transacted in this state by, for or on behalf of a non-resident person * * * shall be subject to taxation; and all such property of persons residing in this state used in and arising out of business transacted outside of this state by, for or on behalf of such persons * * * shall not be subject to taxation * * *

"*Section 5328-2 GC*: Property of the kinds and classes herein mentioned, when used in business, shall be considered to arise out of business transacted in a state other than that in which the owner thereof resides in the cases and under the circumstances following:

"In the case of accounts receivable, when resulting from the sale of property sold by an agent having an office in such other

accounts receivable which each appellant derived from shipments originating at Ohio manufacturing plants. The specific ground stated for assessment was that such receivables "result from the sale of property from a stock of goods maintained within this state."

The Board of Tax Appeals affirmed both assessments and in the Distiller's case set forth the above mentioned statutes and pointed out wherein its own views and practices as to their application to accounts receivable had been modified

---

state or from a stock of goods maintained therein, or from services performed by an officer, agent or employe connected with, sent from, or reporting to any officer or at any office located in such other state.

     *        *        *        *        *

"The provisions of this section shall be reciprocally applied, to the end that all property of the kinds and classes mentioned in this section having a business situs in this state shall be taxed herein and no property of such kinds and classes belonging to a person residing in this state and having a business situs outside of this state shall be taxed. It is hereby declared that the assignment of a business situs outside of this state to property of a person residing in this state in any case and under any circumstances mentioned in this section is inseparable from the assignment of such situs in this state to property of a person residing outside of this state in a like case and under similar circumstances. * * *.

"*Section 5325-1 GC*: * * * Moneys, deposits, investments, accounts receivable and prepaid items, and other taxable intangibles shall be considered to be 'used' when they or the avails thereof are being applied, or are intended to be applied in the conduct of the business, whether in this state or elsewhere. * * *

"*Section 5338 GC*: Annual taxes are hereby levied on the kinds and classes of intangible property, hereinafter enumerated, on the classified tax list in the offices of the county auditors and duplicates thereof in the offices of the county treasurers at the following rates, to wit:

"* * * moneys, credits and all other taxable intangibles so listed, three mills on the dollar. * * *

"*Section 5327 GC*: The term 'credits' as so used, means the excess of the sum of all current accounts receivable and prepaid items (used) in business when added together estimating every such account and item at its true value in money, over and above the sum of current accounts payable of business, other than taxes and assessments. * * *" Ohio Gen. Code Ann. (1945).

by decisions of the Ohio Supreme Court, whose interpretations, for our purposes, become a part of the statutes. The Board said:

"\* \* \* On a consideration of the statutory provisions above noted, the Board of Tax Appeals was of the view that before a business situs of accounts receivable and other intangible property, for purposes of taxation, could be given to a state other than the state of domicile of the taxpayer, it must appear that such receivables or other intangible property not only arose in the conduct of the business of the taxpayer in such other state, but were therein so used as to become an integral part of the business carried on in such other state; and that it was not sufficient that such accounts receivable and other intangible property be used in business generally by the taxpayer. And on this view the Board held that the accounts receivable there in question, although they arose in the conduct of taxpayer's business in the states of Indiana and Michigan, did not have a business situs in such states, and that such accounts receivable were taxable in Ohio.

"On the appeal of the decision of the Board of Tax Appeals in The Ransom & Randolph Co. case to the Supreme Court of Ohio, that Court reversed the decision of the Board of Tax Appeals upon the point above indicated. **142 Oh St 398, 404, 27 O. O. 348, 52 N. E. 2d 738.** That court, upon consideration of the applicable provisions of §5328-2 GC and related sections above noted, held that the accounts receivable of a . taxpayer which arose in the conduct of its business in a state or states other than the state in which it had its domicile or place of residence, had a business situs in such other state or states if such accounts receivable or the avails thereof are being applied or are intended to be applied in the conduct of the taxpayer's business, whether in this state or elsewhere. This view of the Supreme Court as to the construction to be placed upon the statutory provisions here in question was later followed by that court in its decision in the cases of **The Haverfield Company v. Evatt, Tax Comm., 143 Oh St 58, 28 O. O. 16, 54 N. E. 2d 149,** and **National Cash Register Company v. Evatt, Tax Comm., 145 Oh St 597, 31 O. O. 218, 62 N. E. 2d 327.**

"\* \* \* In this situation, and applying the statutory provisions here in question as the same have been construed by the Supreme Court of this state, it follows that since the accounts receivable of the appellant corporation involved in this case arose—as this Board hereby find—, in the conduct

of its business in the state of Ohio by the sale of its products from a stock of goods located in this state, and since, further, such accounts receivable or the avails thereof were used or were intended to be used by the appellant in its business, whether in this state or elsewhere, such accounts receivable have a business and taxable situs in the state of Ohio, as found and determined by the tax commissioner.

"With respect to a question such as that here presented, to wit, that as to the taxation of the accounts receivable of a foreign corporation arising in the conduct of its business in this state, the application of the above noted provisions of §§5328-1, 5328-2 GC and other related sections, as the same have been construed by the Supreme Court, presents, to our mind, a serious question as to the constitutionality of said statutory provisions as so construed under the Due Process of Law clause of the Federal Constitution. * * *"

The Ohio Supreme Court affirmed in both cases (150 Oh St, 229) which were brought here by appeals. (28 U. S. C. §1257 [2], 28 U. S. C. A. §1257 [2]).

Appellants urge that the question which the Board of Tax Appeals regarded as serious should be resolved against the state on the ground that these intangibles had no situs in Ohio to sustain its power under the Due Process Clause so to tax them and also that to do so imposes an undue burden on interstate commerce in violation of the Commerce Clause. They point out that the credits sought to be taxed here were not created in Ohio, not payable there, and neither the payor nor payee, debtor nor creditor, was resident there. Moreover, the receivables arose from a contract for sale of goods, but the contracts were not made in Ohio nor performed in Ohio, and neither buyer nor seller resided there. On the assumption that Ohio could not follow tangible goods into a foreign state and tax them, either in the hands of the vendor before delivery or in the hands of a vendee after delivery, it is argued that she has no greater power to tax intangibles substituted in a foreign state for them and has no right to tax intangible proceeds of the sale of tangible goods that had passed beyond her taxing power.

In their original application of the statutory scheme the taxing authorities sought to overcome this hurdle by requiring an additional and more substantial connection between the taxed intangibles and the state taxing power. For purpose of an Ohio tax the Board of Tax Appeals held intangibles to have a situs in that state only when and to the extent "so used as to become an integral part of the business carried on"

in Ohio. It was this requirement which the Supreme Court of the state eliminated by **Ransom & Randolph Co. v. Evatt, 142. Oh St 398, 27 O. O. 348,** 52 N. E. 2d 738, when it held that any use of the intangibles in the general business was sufficient. to make them taxable. Thus was cut the connection which the Board of Tax Appeals originally invoked to confer juris-- diction to tax, and thus was raised the question of constitu-- tionality regarded by the Board as serious.

However, we find it inappropriate to decide the Due Process. question. The state action, which is reviewable under the Fourteenth Amendment, is the composite result of both legis- lation and its judicial interpretation. Ohio does not attempt and has not asserted power to tax all such intangibles, but only those owned by nonresidents and foreign corporations. It has given no indication that it intends to or would reach out to tax such intangibles as we have here unless it may at the same time exempt identical ones owned by its resi- dents and domestic corporations. The contrary is indicated by §5328-2 GC, which makes the two inseparable. We deal with the taxing plan as an entirety as we find it in operation and pass only on the constitutionality of that which the state has asserted power and purpose to do.

The state action and policy resulting from statute and de- cisions is certified to us by the appellee, the Tax Commissioner of Ohio, to be as follows:

"* * * since the decision of the Supreme Court of Ohio in. **Ransom & Randolph v. Evatt, 142 Oh St 398, 27 O. O. 348,.** 52 N. E. 2d 738 (January 12, 1944) and in obedience thereto, it has been the policy and practice of said Department of Taxa- tion to construe and apply §§5328-1 and 5328-2 GC.

"(A) so as to exempt from taxation in Ohio accounts re- ceivable of Ohio residents, including domestic corporations,. which arise.

"(1) from a sale of goods by an agent having an office in another state, even though such goods be shipped from. Ohio, or

"(2) from a sale of goods shipped from another state, even though such goods be sold by an agent having an office in Ohio;

"(B) so as to tax in Ohio accounts receivable of non-resi- dents of Ohio, including foreign corporations, which arise either

"(1) from a sale of goods shipped from Ohio, even though such goods be sold by an agent having an office in another state, or

"(2) from a sale of goods by an agent having an office in

Ohio, even though such goods be shipped from another state.

"That the foregoing have been in effect as the only tests of taxability of accounts receivable in Ohio since the decision of the Supreme Court of Ohio in the case of **Ransom & Randolph v. Evatt, 142 Oh St 398, 27 O. O. 348,** 52 N. E. 2d 738, and that said tests have been applied without deviation both by affiant and by his predecessor in office, William S. Evatt, as the result of the holding in that case."

Under long settled principles of our Federation, Ohio was not required to admit these foreign corporations to carry on intrastate business within its borders. The state may arbitrarily exclude them or may license them upon any terms it sees fit, apart from exacting surrender of rights derived from the Constitution of the United States. Hanover Insurance Co. v. Harding, 272 U. S. 494, 507, 47 S. Ct. 179, 182, 71 L. Ed. 372, 49 A. L. R. 713; Connecticut General Co. v. Johnson, 303 U. S. 77, 79-80, 58 S. Ct. 436, 82 L. Ed. 673. Ohio elected, however, to admit these corporations to transact businesses and operate manufacturing plants in the state. For that privilege they have paid all that the state required by way of franchise or privilege tax, which includes in its measure the value of all property owned and business done in Ohio. **Secs. 5495, 5497, 5498 and 5499 GC.** See International Harvester Co. v. Evatt, 329 U. S. 416, 67 S. Ct. 444, 91 L. Ed. 390. After a state has chosen to domesticate foreign corporations, the adopted corporations are entitled to equal protection with the state's own corporate progeny, at least to the extent that their property is entitled to an equally favorable ad valorem tax basis. Hanover Insurance Co. v. Harding, 272 U. S. 494, 510-511, 47 S. Ct 179, 183, 71 L. Ed. 372, 49 A. L. R. 713; Power Co. v. Saunders, 274 U. S. 490, 493, 497, 47 S. Ct. 678, 679, 680, 71 L. Ed. 1165. Ohio holds this tax on intangibles to be an ad valorem property tax, **Bennett v. Evatt, 145 Oh St 587, 31 O. O. 214,** 62 N. E. 2d. 345, and in no sense a franchise, privilege, occupation or income tax.

The Ohio statutory scheme assimilates its own corporate creations to natural residents and all others to nonresidents. While this classification is a permissible basis for some different rights and liabilities, we have held, as to taxation of intangibles, that the federal right of a non-resident "is the right to equal treatment." Hillsborough v. Cromwell, 326 U. S. 620, 623, 66 S. Ct. 445, 448, 90 L. Ed. 358.

The certificate of the Tax Commissioner discloses how fundamentally discriminatory is the application of this ad valorem tax to intangibles when owned by a resident or a domestic

corporation as contrasted with its application when those are owned by a domesticated corporation or a nonresident. If on the taxing date one of these petitioners and an Ohio competitor each owns an account receivable of the same amount from the same out-of-state customer for the same kind of commodity, both shipped from a manufacturing plant in Ohio and both sold out of Ohio by an agent having an office out of the state, appellant's account receivable would be subject to Ohio's ad valorem tax and the one held by the competing domestic corporation would not. It seems obvious that appellants are not accorded equal treatment, and the inequality is not because of the slightest difference in Ohio's relation to the decisive transaction, but solely because of the different residence of the owner.

The state does not seriously deny this unequal application of its own tax but claims that reciprocity provisions of the statute reestablish equality. Those provisions therefore require scrutiny.

This entire taxing plan rests on a statutory formula for fixing situs of intangible property both within and without the state. This is provided by §5328-2 GC. These intangibles "shall be considered to arise out of business transacted in a **state other than that in which the owner thereof resides**" under certain circumstances. (Emphasis ours.) This basic rule separates the situs of intangibles from the residence of their owner whereas it has traditionally been at such residence, though with some exceptions. The effect is that intangibles of nonresident owners are assigned a situs within the taxing reach of Ohio while those of its residents are assigned a situs without. The plan may be said to be logically consistent in that, while it draws all such intangibles of nonresidents within the taxing power of Ohio, it by the same formula excludes those of residents. The exempted intangibles of residents are offered up to the taxing power of other states which may embrace this doctrine of a tax situs separate from residence. This is what is meant here by reciprocity, and the two provisions are declared inseparable; so that if the formula by which Ohio takes unto itself the accounts of nonresidents is held invalid, "such decision shall be deemed also to affect such provision as applied to the property of a resident."

It is hard to see that this offer of reciprocity restores to appellants any of the equality which the application of the Ohio tax, considered alone, so obviously denies. There is no indication of a readiness by other states to copy Ohio's situs scheme so as to tax that which Ohio exempts. The proffered

exchange of residents for intangible tax purposes may not commend itself as an even bargain between states. Ohio, being large, populous and highly industrialized, with heavy and basic industries, may well have much more to gain from a plan the effect of which is to tax credit exports to other states, than most states would have from a privilege to tax its own exports into Ohio. In the several years that the Ohio statute has been on the books, no other state has sought to take advantage of the "reciprocity" proffer. And if it did, the equality of rates which would also be necessary to equalize the burden between nonresidents and their resident competitors could be hardly expected nor is it provided for. Far from acceding to the situs doctrine which allocates these receivables to Ohio, the state of West Virginia stands on the very different situs doctrine approved by this Court in Wheeling Steel Corp. v. Fox, 298 U. S. 193, 56 S. Ct. 773, 80 L. Ed. 1143, and under its authority has for the year in question taxed all of the receivables of the Wheeling Company, including those Ohio seeks to claim as having situs in Ohio. It is clear that this plan of "reciprocity" is not one which by credits or otherwise protects the nonresident or foreign corporation against the discriminations apparent in the Ohio statute. We think these discriminations deny appellants equal protection of Ohio law.

The judgments are reversed and the causes remanded for proceedings not inconsistent herewith. Reversed.

JACKSON, J. The writer of the Court's opinion deems it necessary to complete the record by pointing out why, in writing by assignment for the Court, he assumed without discussion that the protections of the Fourteenth Amendment are available to a corporation. It was not questioned by the State in this case, nor was it considered by the courts below. It has consistently been held by this Court that the Fourteenth Amendment assures corporations equal protection of the laws, at least since 1886, Santa Clara Co. v. Southern Pacific R. Co., 118 U. S. 394, 396, 6 S. Ct. 1132, 30 L. Ed. 118, and that it entitles them to due process of law, at least since 1889, Minneapolis R. Co. v. Beckwith, 129 U. S. 26, 28, 9 S. Ct. 207, 32 L. Ed. 585.

It is true that this proposition was once challenged by one Justice. Connecticut General Co. v. Johnson, 303 U. S. 77, 83, 58 S. Ct. 436, 439, 82 L. Ed. 673 (dissenting opinion). But the challenge did not commend itself, even to such consistent liberals as Mr. Justice Brandeis and Mr. Justice Stone, and I had supposed it was no longer pressed. See the same Justice's

separate opinion in International Shoe Co. v. State of Washington, 326 U. S. 310, 322, 66 S. Ct. 154, 161, 90 L. Ed. 95, 161 A. L. R. 1057, making no mention of this issue.

Mr. Justice Douglas says, as the reason for reviving the question at this time and in this case, "Heretofore I have not had to face the issue squarely." This intimation that the Court's opinion in this case is the first to commit him to a doctrine to which he now announces objection, is unwarranted.

Without pretending to a complete analysis, I find that in at least two cases during this current term the same question was appropriate for consideration, as here. In Railway Express v. New York, 336 U. S. 106, 69 S. Ct. 463, a corporation claimed to be deprived of both due process and equal protection of the law, and in Ott v. Mississippi Barge Line, 336 U. S. 169, 69 S. Ct. 432, a corporation claimed to be denied due process of law. At prior terms, in many cases the question was also inherent, for corporations made similar claims under the Fourteenth Amendment. See, e. g., Illinois Central R. Co. v. Minnesota, 309 U. S. 157, 60 S. Ct. 419, 84 L. Ed. 670; Lincoln Life Insurance Co. v. Read, 325 U. S. 673, 65 S. Ct. 1220, 89 L. Ed. 1861; Queenside Hills Co. v. Saxl, 328 U. S. 80, 66 S. Ct. 850, 90 L. Ed. 1096. Although the author of the present dissent was the writer of each of the cited Court's opinions, it was not intimated therein that there was even doubt whether the corporations had standing to raise the questions or were entitled to protection of the Amendment. Instead, in each case the author, as I have done in this case, proceeded to discuss and dispose of the corporation's contentions on their merits, a quite improper procedure, I should think, if the corporation had no standing to raise the constitutional questions. Indeed, if the corporation had no such right, it is difficult to see how this Court would have jurisdiction to consider the case at all.

It may be said that in the foregoing cases other grounds might have been found upon which to defeat the corporations' claims, while in the present case apparently there is none.

However, in at least two cases this Court has recently supported corporations in striking down state action by invoking their rights under the Fourteenth Amendment. In Times-Mirror Co. v. California, companion case to Bridges v. California, 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192, 159 A. L. R. 1346, a newspaper corporation persuaded this Court that a $500 fine assessed against it violated its rights under the Fourteenth Amendment. In Pennekamp v. Florida, 328 U. S.

331, 66 S. Ct. 1029, 90 L. Ed. 1295, a newspaper corporation was convicted along with an individual defendant, and this Court set aside the conviction upon the ground that the Fourteenth Amendment prohibited such state action. In neither of these cases was the corporation's right to raise the issue questioned and the result in each case was irreconcilable with the position now asserted in dissent.

It cannot be suggested that in cases where the author is the mere instrument of the court he must forego expression of his own convictions. Mr. Justice Cardozo taught us how Justices may write for the court and still reserve their own positions, though overruled. Helvering v. Davis, 301 U. S. 619. 639, 57 S. Ct. 904, 908, 81 L. Ed. 1307, 109 A. L. R. 1319.

In view of this record I did not, and still do not, consider it necessary for the Court opinion to review the considerations which justify the assumption that these corporations have standing to raise the issues decided.

Mr. JUSTICE DOUGLAS, with whom Mr. JUSTICE BLACK concurs, dissenting.

It has been implicit in all of our decisions since 1886 that a corporation is a "person" within the meaning of the Equal Protection Clause of the Fourteenth Amendment. Santa Clara Co. v. South. Pacific R. Co., 118 U. S. 394, 396, 6 S. Ct., 1132, 30 L. Ed. 118, so held. The Court was cryptic in its decision. It was so sure of its ground that it wrote no opinion on the point, Chief Justice Waite announcing from the bench:

"The court does not wish to hear argument on the question whether the provision in the Fourteenth Amendment to the Constitution, which forbids a State to deny to any person within its jurisdiction the equal protection of the laws, applies to these corporations. We are all of the opinion that it does."

There was no history, logic, or reason given to support that view. Nor was the result so obvious that exposition was unnecessary.

The Fourteenth Amendment became a part of the Constitution in 1868. In 1871 a corporation claimed that Louisiana had imposed on it a tax that violated the Equal Protection Clause of the new Amendment. Mr. Justice Woods (then Circuit Judge) held that "person" as there used did not include a corporation and added, "This construction of the section is strengthened by the history of the submission by congress, and the adoption by the states of the 14th amend-

ment so fresh in all minds as to need no rehearsal." Insurance Co. v. New Orleans, Fed. Cas. No. 7,051, 1 Woods 85, 88.

What was obvious to Mr. Justice Woods in 1871 was still plain to the Court in 1873. Mr. Justice Miller in the Slaughter House Cases, 16 Wall. 36, 71, 21 L. Ed. 394, adverted to events "almost too recent to be called history" to show that the purpose of the Amendment was to protect human rights—primarily the rights of a race which had just won its freedom. And as respects the Equal Protection Clause he stated, "The existence of laws in the States where the newly emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied by this clause, and by it such laws are forbidden." 16 Wall. at page 81, 21 L. Ed. 394.

Moreover what was clear to these earlier judges was apparently plain to the people who voted to make the Fourteenth Amendment a part of our Constitution. For as Mr. Justice Black pointed out in his dissent in Connecticut General Co. v. Johnson, 303 U. S. 77, 87, 58 S. Ct. 436, 441, 82 L. Ed. 873, the submission of the Amendment to the people was on the basis that it protected human beings. There was no suggestion in its submission that it was designed to put negroes and corporations into one class and so dilute the police power of the States over corporate affairs. Arthur Twining Hadley once wrote that "The Fourteenth Amendment was framed to protect the negroes from oppression by the whites, not to protect corporations from oppression by the legislature. It is doubtful whether a single one of the members of Congress who voted for it had any idea that it would touch the question of corporate regulation at all"[1]

Both Mr. Justice Woods in Insurance Co. v. New Orleans, supra, Fed. Cas. No. 7,052, 1 Woods page 88, and Mr. Justice Black in his dissent in Connecticut General Co. v. Johnson, supra, 303 U. S. at pages 88-89, 58 S. Ct. at page 441, 442, 82 L. Ed. 873, have shown how strained a construction it is of the

---

1. The Constitutional Position of Property in America, 64 Independent 834, 836 (1908). He went on to say that the Dartmouth College case, 4 Wheat. 518, 4 L. Ed. 629, and the construction given the Fourteenth Amendment in the Santa Clara case "have had the effect of placing the modern industrial corporation in an almost impregnable constitutional position." Id., p. 836.

As to whether the framers of the Amendment may have had such an undisclosed purpose see Graham, The "Conspiracy Theory" of the Fourteenth Amendment, 47 Yale L. J. 371.

Fourteenth Amendment so to hold. Section 1 of the Amendment provides:

"All **persons** born or naturalized in the United States, and subject to the jurisdiction thereof, are **citizens** of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of **citizens** of the United States; nor shall any State deprive any **person** of life, liberty, or property, without due process of law; nor deny to any **person** within its jurisdiction the equal protection of the laws." (Emphasis ours.)

"Persons" in the first sentence plainly include only human beings, for corporations are not "born or naturalized."

Corporations are not "citizens" within the meaning of the first clause of the second sentence. Western Turf Ass'n v. Greenberg, 204 U. S. 359, 363, 27 S. Ct. 384, 385, 51 L. Ed. 520; Selover, Bates & Co. v. Walsh, 226 U. S. 112, 126, 33 S. Ct. 69, 72, 57 L. Ed. 146[2]

It has never been held that they are persons whom a State may not deprive of "life" within the meaning of the second clause of the second sentence.

"Liberty" in that clause is "the liberty of natural, not artificial, persons." Western Turf Ass'n v. Greenberg, supra, 204 U. S. at page 363, 27 S. Ct. at page 385, 386, 51 L. Ed. 520.

But "property" as used in that clause has been held to include that of a corporation since 1889 when Minneapolis R. Co. v. Beckwith, 129 U. S. 26, 9 S. Ct. 207, 32 L. Ed. 585, was decided.

It requires distortion to read "person" as meaning one thing, then another within the same clause and from clause to clause. It means, in my opinion, a substantial revision of the Fourteenth Amendment. As to the matter of construction, the sense seems to me to be with Mr. Justice Woods in Insurance Co. v. New Orleans, supra, Fed. Cas. No. 7,052, 1 Woods at page 88, where he said, "The plain and evident meaning of the section is, that the persons to whom the equal protection of the law is secured are persons born or naturalized or endowed with life and liberty, and consequently natural and not artificial persons."

---

2. Cf. McGovney, A Supreme Court Fiction, 56 Harv. L. Rev. 853, 1090, 1225, dealing with corporations in the diverse citizenship jurisdiction of the federal courts.

History has gone the other way. Since 1886 the Court has repeatedly struck down state legislation as applied to corporations on the ground that it violated the Equal Protection Clause.[3] Every one of our decisions upholding legislation as applied to corporations over the objection that it violated the Equal Protection Clause has assumed that they are entitled to the constitutional protection. But in those cases it was not necessary to meet the issue since the state law was not found to contain the elements of discrimination which the

3. See Chicago & R. Co. v. Minnesota, 134 U. S. 418, 10 S. Ct. 462, 702, 33 L. Ed. 970; Gulf, Colorado & Santa Fe R. Co. v. Ellis, 165 U. S. 150, 17 S. Ct. 255, 41 L. Ed. 666; Cotting v. Kansas City Stockyards Co, 183 U. S. 79, 22 S. Ct. 30, 46 L. Ed. 92; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 S. Ct. 431, 46 L. Ed. 679; Southern R. Co. v. Greene, 216 U. S. 400, 30 S. Ct. 287, 54 L. Ed. 536; Herndon v. Chicago Rock Island & Pac. R. Co., 218 U. S. 135, 30 S. Ct. 633, 54 L. Ed. 970; Roach v. Atchison, T. & Santa Fe R. Co., 218 U. S. 159, 30 S. Ct. 639, 54 L. Ed. 978; Atchison & Santa Fe R. Co. v. Vosburg, 238 U. S. 56, 35 S. Ct. 675, 59 L. Ed. 1119, L. R. A. 1915E, 953; Gast Realty Co. v. Schneider Granite Co., 240 U. S. 55, 36 S. Ct. 400, 60 L. Ed. 1239; McFarland v. American Sugar Co., 241 U. S. 79, 36 S. Ct. 498, 60 L. Ed. 899; Royster Guano Co. v. Virginia, 253 U. S. 412, 40 S. Ct. 560, 64 L. Ed. 989; Bethlehem Motors Co. v. Flynt, 256 U. S. 421, 41 S. Ct. 571, 65 L. Ed. 1029; Kansas City So. R. Co. v. Road Imp. Dist. No. 6, 256 U. S. 658, 41 S. Ct. 604, 65 L. Ed. 1151; Chicago & N. W. R. Co. v. Nye Co., 260 U. S. 35, 43 S. Ct. 55, 67 L. Ed. 115; Sioux City Bridge v. Dakota County, 260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979; Thomas v. Kansas City So. R. Co., 261 U. S. 481, 43 S. Ct. 440, 67 L. Ed. 758; Kentucky Co. v. Paramount Exch., 262 U. S. 544, 43 S. Ct. 636, 67 L. Ed. 1112; Air-Way Corp. v. Day, 266 U. S. 71, 45 S. Ct. 12, 69 L. Ed. 169; Hanover Ins. Co. v. Harding, 272 U. S. 494, 47 S. Ct. 179, 71 L. Ed. 372, 49 A. L. R. 713; Power Co. v. Saunders, 274 U. S. 490, 47 S. Ct. 678, 71 L. Ed. 1165; Louisville Gas Co. v. Coleman, 277 U. S. 32, 48 S. Ct. 423, 72 L. Ed. 770; Quaker City Cab Co. v. Pennsylvania, 277 U. S. 389, 48 S. Ct. 553, 72 L. Ed. 927; Cumberland Coal Co. v. Board, 284 U. S. 23, 52 S. Ct. 48, 76 L. Ed. 146; Liggett Co. v. Lee, 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699; Concordia Ins. Co. v. Illinois, 292 U. S. 535, 54 S. Ct. 830, 78 L. Ed. 1411; Stewart Dry Goods Co. v. Lewis, 294 U. S. 550, 55 S. Ct. 525, 79 L. Ed. 1054; Mayflower Farms v. Ten Eyck, 297 U. S. 266, 56 S. Ct. 457, 80 L. Ed. 675; Hartford Co. v. Harrison, 301 U. S. 459, 57 S. Ct. 838, 81 L. Ed. 1223.

Equal Protection Clause condemns. But now that the question is squarely presented I can only conclude that the Santa Clara case was wrong and should be overruled.

One hesitates to overrule cases even in the constitutional field that are of an old vintage. But that has never been a deterrent heretofore[4] and should not be now.

We are dealing with a question of vital concern to the people of the nation. It may be most desirable to give corporations this protection from the operation of the legislative process. But that question is not for us. It is for the people. If they want corporations to be treated as humans are treated, if they want to grant corporations this large degree of emancipation from state regulation,[5] they should say so. The Constitution provides a method by which they may do so. We should not do it for them through the guise of interpretation.

---

4. In re Ayers, 123 U. S. 443, 8 S. Ct. 164, 31 L. Ed. 216, overruled in part Osborn v. United States Bank, 9 Wheat 738, 6 L. Ed. 204, a decision 63 years old; Leisy v. Hardin, 135 U. S. 100, 10 S. Ct. 681, 34 L. Ed. 128, overruled Peirce v. New Hampshire, 5 How. 504, 12 L. Ed. 256, a decision 42 years old. Erie R. Co. v. Tompkins, 304 U. S. 64, 58 S. Ct. 817, 82 L. Ed. 1188, 114 A. L. R. 1487, overruled Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865, a decision 95 years old; Graves v. New York ex rel. O'Keefe, 306 U. S. 466, 59 S. Ct. 595, 83 L. Ed. 927, 120 A. L. R. 1466, overruled Collector v. Day, 11 Wall. 113, 20 L. Ed. 122, a decision 68 years old. United States v. South Eastern Underwriter's Ass'n. 322 U. S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440, overruled in part Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357, a decision 75 years old.

5. The restrictions on state power which are contained in the Commerce Clause and which may prevent the States from burdening interstate commerce, see Southern Pacific Co. v. Arizona, 325 U. S. 761, 65 S. Ct. 1515, 89 L. Ed. 1915; Morgan v. Virginia, 328 U. S. 373, 66 S. Ct. 1050, 90 L. Ed. 1317, 165 A. L. R. 574; or discriminating against it, see Nippert v. Richmond, 327 U. S. 416, 66 S. Ct. 586, 90 L. Ed. 760, 162 A. L. R. 844, rise from a different source and are not relevant here.